## WILLIAM J. MEYERS *v.* MARGARET MURPHY.

[No. 25, October Term, 1942.]

*Decided November 18, 1942.*

The cause was argued before BOND, C. J., SLOAN, DELAPLAINE, COLLINS, MARBURY, and GRASON, JJ.

*George B. Woelfel* for the appellant.

*Wilbur R. Dulin* and *Dulany Foster*, with whom were *Weinberg & Green* on the brief, for the appellee.

MARBURY, J., delivered the opinion of the Court.

Appellee filed her bill of complaint in the Circuit Court for Anne Arundel County to have annulled the release of a mortgage from the appellant to her, which release she claimed to have signed through fraud and misrepresentation on the part of the appellant and without any consideration. After answer, testimony was taken before the court and a decree was signed granting relief asked. From this decree the case comes here on appeal.

No question arises in the case as to the rights of third parties, so that it becomes unnecessary to consider whether the fraud claimed is fraud in the *factum* or

fraud in the treaty. Fraud in the *factum* is said to arise from the want of identity or disparity between the instrument executed and the one intended to be executed, or from circumstances which go to the question whether the instrument in fact ever had any legal existence. Fraud in the treaty is a term used to describe a situation where a person is induced by some fraudulent representation or pretense to execute the very instrument which is intended to be executed, for example, where a person who can read neglects to read a paper because of some false representation and signs it with a misapprehension as to the contents. The difference between the two kinds of fraud becomes important only in relation to third parties, because fraud in the *factum* makes the instrument absolutely void, whereas fraud in the treaty renders it voidable and brings into play the equitable principle that where one of two innocent parties suffer from the act of the third, he who has enabled such third person to occasion the loss must sustain it. *Furst & Thomas v. Merritt,* 190 N. C. 397, 130 S. E. 40.

It is fully within the power of an equity court to give relief in cases of fraud or misrepresentation between the original parties to the execution of an instrument in either kind of fraud. It makes no difference whether such instrument is under seal or not. *Schaferman v. O'Brien,* 28 Md. 565, 92 *Am. Dec.* 708; *Arthur v. Morrow Bros.,* 131 Md. 59, 101 A. 777. The burden of proof is upon the complainant, and the question for the court to determine is whether the facts shown indicate fraud or misrepresentation. In the case before us, there is no question that if the complainant's testimony is to be believed, there was fraud. The defendant's testimony is to the contrary. It becomes merely a matter of weighing the evidence.

The appellant was a dealer in second-hand automobiles in the city of Baltimore, doing a business which he estimates as from $200,000 to $250,000 a year. He was a widower at the time of the transaction complained of, but has since married again. The appellee holds an im-

portant position in a large department store in the city of Baltimore at a good salary. She also had previously been married, but whether she was a widow or divorced does not appear in the testimony. Her work required her to go to New York practically every other week, and she was evidently a capable buyer. She had, however, no experience whatever in real estate matters, knew nothing about mortgages or deeds, and her personal financial dealings had to do only with deposits in savings banks and checking accounts and taking out insurance policies. The parties met in 1935, became increasingly friendly during the succeeding years, and according to the testimony of the appellee, they became engaged to be married. The appellant denies this, but admits that he was "going with her," whatever that may mean. At any rate, she made frequent visits to the appellant's cottage at Edgewater Beach and appeared to be much at home there.

In the early part of 1938, it is agreed by all parties that the appellant had to raise about $17,000 and he told Miss Murphy and Raymond Neudecker, a Washington lawyer who had property near Mr. Meyers, of his need. As a result, it was agreed that Mr. Neudecker should lend Mr. Meyers $3,000 secured by a second mortgage on the South River property, and that Miss Murphy should also lend him $3,000 secured by a third mortgage on the same property. There was at the time a first mortgage on the property for $5,500 to the Equitable Trust Company. These two new mortgages were prepared by Mr. Neudecker, were executed by Mr. Meyers and were put on record by him. The Murphy mortgage was not acknowledged by anyone as to the consideration. The testimony of both parties is that Miss Murphy had only $2,000 in cash of her own, which she gave the appellant, and that she was unable to raise the additional thousand in cash. It does appear, however, from the record, that she paid interest on the Equitable Trust mortgage for Mr. Meyers from time to time, and she also testified that she gave him $200 which she had bor-

rowed on her insurance. These payments amount to $1,079.53. Mr. Meyers admits the interest payments on the mortgage but says they were gifts made because Miss Murphy had the use of his place and they were not to be included in the mortgage. He says that the $200 check he cashed, but gave her the money and it was not given to him.

In the early part of 1940, the parties had a disagreement and did not see each other any more, and Miss Murphy's testimony is that in September of that year she called him up and said: "Now our friendship is broken off I would like to have the mortgage in my possession." At that time she was told that she had signed a release. On October 15 she had a further conversation with Mr. Meyers over the telephone, to which one of her friends was a witness listening in. According to this testimony, Mr. Meyers admitted he had not paid her anything, but he had gotten her to sign a release because he knew if anything happened he would have trouble with her. Immediately after that conversation, the appellee consulted a lawyer and the following May, the bill was filed.

The testimony as to the circumstances under which the release was signed differs widely. Miss Murphy's statement is that one evening after they had had dinner, Mr. Meyers told her that he had just had an accident, that he had been in an automobile accident, and that if anything happened to her, her mother, who was dependent on her for support, would not be protected, and that she ought to "sign the mortgage." She consented to do this under those circumstances, thinking that it should be done, and not knowing anything about mortgages. She went with Mr. Meyers to his place of business. He brought out some papers, and she signed one of them without reading it in a blank space where he told her, and where there was no writing. Her signature was witnessed by Mr. Meyers' bookkeeper whom she says was standing in the rear of the office and to whom she said: "Do I have to sign all these papers?" And the

bookkeeper said: "Knowing Mr. Meyers as well as you do, I don't think it is necessary for you to read them." Miss Murphy signed where Mr. Meyers indicated, and at the time she says the bookkeeper was nowhere near her. No payment was made at the time, and no mention was made of any release. Miss Murphy says that Mr. Meyers neither then nor at any other time has ever paid her back a cent. Mr. Meyers, on the contrary, says that he did pay Miss Murphy $2,000 and he gives definite dates from the back of an envelope on which he claimed to have made the entries at the time he made the payments, and which he kept in his safe. These entries are $300 on December 24, 1938, and the balance, $200 each month in 1939 until July 25, when he claims he made the final payment of $500. This, he says, was the time the release was executed, although the date on the release is not the 25th, but the 29th. The payments were all made in cash, according to his testimony.

His bookkeeper corroborates the appellant in the matter of the execution of the release. He says that Mr. Meyers asked him in the presence of Miss Murphy: "Will you witness her signature to this release, I want to pay her the balance on this mortgage"; that that was all that was said; that he was about a foot from Miss Murphy when she signed the release; and that he saw her pick up some money which Mr. Meyers had lying on the safe; that Miss Murphy did not have the conversation with him about signing the papers to which she testified. The bookkeeper, Mr. Wentworth, was very definite about this, but his recollection was not so good as to other matters he had attended to, particularly in reference to his taking the acknowledgment of Mr. Neudecker on the latter's mortgage. He testified that the paper was filled in when Miss Murphy signed it and it was not blank as she testified.

Mr. Neudecker was a witness, but his testimony was not important, except that he did have a copy of a letter which Mr. Meyers wrote him, in which he was asked to write the Murphy mortgage for $3,000. Mr. Meyers

has previously denied that he had directed that that amount be filled in.

The trial court called attention in his opinion to the curious fact that during the time when Mr. Meyers said he was repaying at the rate of $200 a month, that is during the first six months of 1939, Miss Murphy was paying his interest at the bank. Mr. Meyers' only explanation of this was that Miss Murphy's payments were gifts. Mr. Meyers had no records which showed his payments except the memoranda on the envelope. He did not know whether or not his books would show anything, but he did not produce his books in evidence.

In any case in which the decision depends so largely, as in this case, upon the truth or falsity of the testimony, the demeanor of the witnesses in giving their evidence becomes of paramount importance. An appellate court can read the testimony, can detect various inconsistencies and consider the probabilities or the improbabilities of the facts stated by the witnesses. The appellate court, however, cannot see the witnesses when they are testifying. The trial court can, and the way in which testimony is given frequently indicates to an experienced judge whether or not a witness is telling the truth. For this reason, in cases where the testimony on each side is directly contrary and where the corroboration is of about equal value, it has been the rule of this court to accept the findings of the trial court. That rule is amply justified for the reasons above given, and this is an appropriate occasion for its exercise. The court below had the opportunity to see these parties testify and concluded that the testimony on behalf of the appellee was more worthy of belief than on behalf of the appellant. For that reason, he determined that the release was obtained by fraud and misrepresentation from the appellee, and he therefore annulled it. There are facts and explanations in the appellant's testimony which justify that conclusion, and these, together with the opportunity the court below had to hear the testimony and to

see the witnesses when they gave it, are sufficient to justify this court in affirming the decree, which we do.

*Decree affirmed, with costs.*