### SAINSBURY v. PENNSYLVANIA GREYHOUND LINES, Inc.

### No. 6110.

United States Court of Appeals
Fourth Circuit.

Argued July 5, 1950.

Decided August 10, 1950.

George B. Woelfel, Annapolis, Md., and Melvin J. Sykes, Baltimore, Md. (Paul Berman, Sigmund Levin, Baltimore, Md., and Thomas J. Curley, Jr., Annapolis, Md., on brief), for appellant.

F. Gray Goudy, Baltimore, Md. (H. Beale Rollins, Baltimore, Md. on brief), for appellee.

Before PARKER, Chief Judge, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This civil action was instituted in the Circuit Court for Baltimore County, Maryland, by Joseph C. Sainsbury, a boatswain's mate, third class, in the United States Navy. The case was properly removed on the ground of diversity of citizenship to the United States District Court for the District of Maryland by the defendant, Pennsylvania Greyhound Lines, Inc. The District Court, sitting without a jury, entered judgment for the defendant and plaintiff has duly appealed.

On June 24, 1949, plaintiff was injured, allegedly due to the negligence of defendant or its agent, when a bus, owned and operated by defendant and on which plaintiff was a passenger, ran off the road and struck an embankment. Plaintiff suffered serious injury as a result of the accident—eight broken ribs, a fracture of the leg and additional minor injuries.

After the accident, which occurred near White Marsh, Maryland, plaintiff was removed to the Johns Hopkins Hospital in Baltimore for first aid treatment, but because of crowded conditions there he had to be taken to a downtown hotel. After some hours at the hotel he went to the United States Marine Hospital and, less than a day later, he was transferred to the Naval Hospital at Annapolis, where he was confined for more than three months. Plaintiff was twenty-three years of age at the time of the accident and had received the equivalent of a high school education.

The claims adjuster for the defendant, T. Benjamin Weston, paid for the treatment given plaintiff at Johns Hopkins Hospital, for ambulance services and for the hotel accommodations which he had procured for the plaintiff. Weston visited the plaintiff once four or five days after the accident and again on July 16, 1949, when he

was accompanied by his friend, a Mr. Smith. Weston was an attorney-at-law and this fact was known to the plaintiff.

We quote from the District Court's opinion, as follows:

"On this second visit this representative of defendant (Weston) asked plaintiff whether he had considered settling his claim for injuries with the defendant and what he would be willing to accept in full settlement. Plaintiff replied that he had not reached any conclusion in the matter, stating that he wanted to speak first to the legal representative of the Navy or to some other lawyer, but asked the claims adjuster what he thought would be a fair settlement, to which the latter replied that he thought $500.00 would be just and reasonable. Plaintiff thereupon said that he understood persons with similar injuries had obtained larger compensation, to which the claims adjuster rejoined that such was true but only in cases of non-service persons, stating that those in the service, like the plaintiff, were in a different situation in the eyes of the law because they obtained from the Government, free of charge, medical and hospital care and also were entitled to disability payments in the event of injury, so that in his present case, he would be entitled to recover from the defendant on account only of the pain that he may have suffered as a result of his injuries.

"After some further discussion, during which plaintiff explained—which the claims adjuster did not deny—that the Navy doctors had told him, the plaintiff, that full recovery from his knee injury was problematical and that an operation might be necessary, plaintiff agreed to accept the claims adjuster's proposal."

Plaintiff testified that Weston told him there was no need of seeing another lawyer or legal officer because that would not do any good for $500.00 was about the maximum he could hope to recover under the circumstances. Defendant, because of the testimony of Smith and Weston, argues that no discussion as to lawyers or permanent disability took place; but the previous quotation from the District Judge's

opinion and his statement at the end of his opinion that he gave "more credence to plaintiff's than to Weston's version of the entire conversation leading up to the execution of the release" is a complete answer to defendant's contention.

Plaintiff executed a release of any claim for injuries received in the accident in reliance upon Weston's representations and in consideration therefor was presented with a check for $500. Plaintiff, after talking with various persons in the Naval Hospital, subsequently decided that he was entitled to more than $500 as compensation for his injuries. He returned the check without endorsement but defendant refused to accept it. After consultation with an attorney, the present suit for damages sustained in the accident was instituted by plaintiff. Defendant claims that the release executed by plaintiff precludes him from prosecuting this litigation. Plaintiff, however, contends that this release was obtained by fraud and is therefore invalid because Weston misrepresented plaintiff's legal rights.

■ The representation by Weston to plaintiff that because he was in the service he could recover only for pain and suffering was a false statement of the law. It is generally well settled that the fact that the plaintiff may receive compensation from a collateral source (or free medical care) is no defense to an action for damages against the person causing the injury. See Standard Oil Co. of California v. U. S., 9 Cir., 153 F.2d 958, 963, affirmed 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067, and the cases therein cited; note, 22 A. L.R. 1558; note, 18 A.L.R. 678-683; McCormick, Damages, 310 note 2, and 324 (1935); 15 American Jurisprudence, Damages, §§ 78, 200-201; Restatement, Torts, § 920, Comment e. It is inconceivable that any member of the bar could have made a statement such as the one made by Weston without knowledge of its falsity or without acting with a reckless disregard for the truth.

■ The rule is also well established that when a lawyer makes a misrepresentation of law to a layman relief may be af-

forded, even though the layman knows the lawyer represents an antagonistic interest. Any other rule would be unconscionable. See Rusch v. Wald, 202 Wis. 462, 464, 232 N.W. 875; Restatement, Torts, § 545, Comment d; 23 American Jurisprudence, Fraud and Deceit, § 48; Prosser, Torts, 761 note 81 (1941), 5 Williston, Contracts, §§ 1487, 1495 and note 4 (1937).

Nevertheless, the District Judge found for the defendant on the ground that the plaintiff had no right to rely on the statement made to him by Weston. The District Judge stated in his opinion: " * * the law does not provide protection to an individual against a contract that he has improvidently or carelessly made in settlement for injuries suffered if, being of adult age, with a reasonable amount of education and intelligence and in possession of his normal faculties, he sees fit, in the absence of duress or pressure, to accept statements made by or on behalf of the person by whom he has been injured, the falsity of which he nevertheless could, by reasonable inquiry, have ascertained."

We believe that the District Judge's conception of the law in this respect is erroneous and that the proper rule is in accord with the view expressed by this Court in Bishop v. E. A. Strout Realty Agency, 4 Cir., 182 F.2d 503, 505. That was an action for deceit based on the fraudulent representations of a real estate agent concerning the depth of water at a fishing camp. In that case, Judge Parker said:

"We do not think that plaintiffs are precluded of recovery because they accepted and relied upon the representations of Davis as to the depth of the water without making soundings or taking other steps to ascertain their truth or falsity. The depth of the water was not a matter that was apparent to ordinary observation; Davis professed to know whereof he was speaking; and there was nothing to put plaintiffs on notice that he was not speaking the truth. There is nothing in law or in reason which requires one to deal as though dealing with a liar or a scoundrel, or that denies the protection of the law to the trustful who have been victimized by fraud. The principle underlying the caveat emptor rule was more highly regarded in former times than it is today; but it was never any credit to the law to allow one who had defrauded another to defend on the ground that his own word should not have been believed. The modern and more sensible rule is that applied by the Court of Appeals of Maryland in Standard Motor Co. v. Peltzer, 147 Md. 509, 510, 128 A. 451, where it was held not to be negligence or folly for a buyer to rely on what had been told him. This is in accord with the modern trend in all jurisdictions which is summed up in A.L.I. Restatement of Torts, sec. 540 as follows:

"'The recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.'" (Italics ours.)

In McGrath v. Peterson, 127 Md. 412, 96 A. 551, 553, the Court of Appeals of Maryland set out an even more liberal rule in regard to avoiding contracts for fraud than obtains in the case of an action for deceit, stating that: "In an action by one party against the other to enforce the contract, a plea of fraud may be sustained, even though the defendant may have been wanting in ordinary prudence in relying on the other's representations as to the tenor or contents of the writing."

See also Meyers v. Murphy, 181 Md. 98, 28 A.2d 861; Columbia Paper Bag Co. of Baltimore City v. Carr, 116 Md. 541, 551, 82 A. 442, 446; Russell v. Carman, 114 Md. 25, 78 A. 903; Wilson, Close & Co. v. Pritchett, 99 Md. 583, 58 A. 360; Prosser, Torts, 747 et seq. (1941); 5 Williston, Contracts, § 1516 (1937).

In the case before us the reasons for vitiating the release are more cogent than in any of the cases which we have cited. Lawyers are, or should be, regarded as possessed of knowledge and integrity beyond that of most of their fellows, certainly above the level of the market place. We find nothing unreasonable or imprudent in the reliance of the plaintiff upon the words of this attorney who had won the plaintiff's confidence through his friendly

552

overtures and through his membership in an honorable profession. As between the parties to the release it is, of course, immaterial whether the fraud is of the factum or the inducement. See Meyers v. Murphy, supra.

We, therefore, hold that the District Court erred in its decision that the release was valid and thus contributed a defense to the plaintiff's claim.

Defendant has filed a motion to dismiss this appeal, based upon happenings on which the District Judge had no opportunity to pass. This motion reads:

"Pennsylvania Greyhound Lines, Inc., the Appellee, by H. Beale Rollins and F. Gray Goudy, its attorneys, respectfully moves this Honorable Court to dismiss the appeal in the above entitled case, and for reason therefore, says:

"That the Appellant has acquiesced in and accepted the findings of the trial court and waived his right of appeal by endorsing, cashing and collecting Appellee's $500.00 settlement draft as is shown by Plaintiff's Exhibit No. 1 Tr. p. 210; that said draft was issued to Appellant by Appellee in consideration of the execution of releases under seal, Defendant's Exhibits 1 and 2 Tr. pp. 211, 212, in full and final settlement of all claims of the Appellant against the Appellee arising out of a bus accident June 24, 1949; that prior to January 20th, 1950, the Appellant refused to endorse the said draft and attempted in this litigation to void and rescind the aforesaid releases and obtain judgment in his favor against Appellee for injuries in the aforesaid accident; that Appellant made a tender of the said draft without endorsement at the trial of the issues herein on December 14th, 1949, Tr. p. 24; that the trial court found against the Appellant in its opinion of December 31st, 1949; that thereafter on or about January 20th, 1950, the Appellant endorsed, cashed and collected the said draft, which affirmative act puts beyond question the voidability of the releases aforesaid, the sole question brought to this Honorable Court on appeal.

"Wherefore, your Petitioner prays:

"That the appeal be dismissed with proper costs to the Appellee."

This draft, not endorsed, was verbally tendered to defendant's counsel, at the trial, by plaintiff's counsel and the draft was formally offered in evidence. The District Judge filed his opinion in favor of defendant December 31, 1949. The draft was endorsed with plaintiff's name on January 20, 1950. The draft, on its face, contained the following words: "Settlement in Full of all claims arising out of accident on June 24th, 1949, at White Marsh, Md." Printed on the back of the draft above the place where the endorsement was made, were the following words: "Make All Endorsements Below. The Amount thereof is Hereby Accepted by the Undersigned as Settlement in Full of the Claim or Account Stated." On February 6, 1950, formal judgment was rendered in favor of defendant in the District Court. An appeal was noted by plaintiff on February 28, 1950.

As to what actually occurred as to the draft, we quote the following from appellant's brief:

"When Judge Coleman's opinion was filed, on December 31, 1949, the appellant was on duty in the Mediterranean. Mr. Woelfel, who was then sole counsel for the appellant, was unable to contact appellant until after Jan. 19, 1950, on which date the appellee's settlement draft, having been outstanding six months without being cashed, by its own terms became void. In order to save the check for the appellant and avoid future dispute about cashing it if appellant decided not to appeal, Mr. Woelfel rubberstamped on the back of the check the words 'For Deposit to Credit of', signed the appellant's name thereunder, and opened an account for appellant in the Annapolis Banking and Trust Company, on January 20, 1950, a day after the check, by its own terms became void. The bank was so dubious about the endorsement that it refused to give Mr. Woelfel a bank book to forward to the appellant until the check cleared. A comparison of appellant's signature on the release with the signature on the back of the

settlement draft will quickly establish that the draft was not endorsed by the appellant.

"The appellant did not know that the draft was cashed until some time after the account for him had been opened by Mr. Woelfel, and as soon as appellant learned of Judge Coleman's decision he authorized counsel to prosecute this appeal and tender the proceeds of the settlement draft; and a certified check for $500 was paid into the registry of this court less than a week after this appeal was docketed, to guarantee payment of that sum to the appellee in the event the judgment below is reversed.

"Mr. Woelfel's sole purpose in cashing the draft was to preserve appellant's rights until he could contact appellant to find out whether appellant desired to appeal the judgment of the court below. Had the appellant decided to abide by the judgment below, cashing the draft was intended to avoid any dispute over the right to cash the draft which on its face would have been invalid after January 19, 1950; and if, as was the fact, appellant would decide to appeal, the proceeds of the draft could be tendered into court and appellee thus fully restored to the status quo."

On oral argument before us, Mr. Woelfel stated that he secured the draft from the files of the District Court.

 We are inclined to accept these statements implicitly, for the statements are entirely consistent with the record before us. But even if we do not accept these statements as true, we yet think the motion to dismiss must be denied on the ground that there is absolutely no showing by defendant that, under the circumstances, Mr. Woelfel had any authority, express or implied, to deal with the draft so as to impair the rights of plaintiff. No such authority may be implied from the mere relationship of client and counsel. United States v. Beebe, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563; Dwight v. Hazlett, 107 W.Va. 192, 147 S.E. 877, 66 A.L.R. 102; 5 American Jurisprudence, Attorneys at Law, §§ 70, 98. And there is not a shred of evidence here to show either that Mr. Woelfel had such authority from his client or that plaintiff subsequently ratified this action of his counsel.

This renders utterly inapplicable the many quotations in defendant's brief.

Thus, in Latrobe v. Dietrich, 114 Md. 8, 78 A. 983, 988, the court quoted with approval, from Grymes v. Sanders, 93 U.S. 55, 23 L.Ed. 798: " 'But if after he discovers the fraud he remains silent, under circumstances in which silence would indicate acquiescence; *or, if he act or deal in relation to the subject-matter in such a mode as to imply a willingness to stand by his bargain, he is considered as ratifying it, and he cannot afterwards avoid it.'* " (Italics supplied.)

See, also, Restatement, Contracts, § 484, where the following appears: "The power of avoidance for fraud or misrepresentation is lost if the injured party after acquiring knowledge of the fraud or misrepresentation manifests to the other party to the transaction an intention to affirm it, or exercises dominion over things restoration of which is a condition of his power of avoidance, * * *." And, see, Brassel v. Electric Welding Co., 239 N.Y. 78, 145 N.E. 745, 746; 12 Am.Jur., Contracts, § 449; 17 Corpus Juris Secundum, Contracts, § 445.

Since we have held that the release signed by plaintiff is invalid and that the conduct of plaintiff's attorney in handling the draft is no defense to plaintiff's claim, the judgment of the District Court is reversed. Defendant, apart from the question of the release, has admitted its liability. The case is, therefore, remanded to the District Court with instructions to proceed to the determination of the amount of damages to which plaintiff is entitled.

Reversed and remanded.