Frank CAUDILL, Jr., Libellant,

v.

VICTORY CARRIERS, Incorporated, a corporation, and THE S.S. LEWIS EMERY, JR., her boilers, etc., Respondents.

No. 7717.

United States District Court
E. D. Virginia, Norfolk Division.

March 5, 1957.

As Amended May 14, 1957.

Sidney H. Kelsey, Norfolk, Va., Stanley J. Bangel, Portsmouth, Va., for libellant.

Seawell, Johnston, McCoy & Winston, Norfolk, Va., Leon T. Seawell, Jr., and Harry E. McCoy, Norfolk, Va., for respondents.

HOFFMAN, District Judge.

This is an action in admiralty instituted by libellant, Frank Caudill, Jr., against the S.S. Lewis Emery, Jr., in rem, and Victory Carriers, Incorporated, in personam, for injuries received by libellant at Whittier, Alaska, while descending a Jacob's ladder leading from the deck of the Lewis Emery to a barge-derrick designated as B.D. 3031, when the ladder parted and libellant fell approximately 25 feet to the steel deck of the barge or floating crane.

While the injuries were alleged to have been sustained on December 5, 1953, and suit was not instituted until March 25, 1955, it appears that libellant was born on November 11, 1933, and, pursuant to the laws of Virginia, the action is brought within the time per-

mitted by law for persons under disability.

Libellant was a corporal in the United States Army attached to duty aboard the 100 ton floating crane B.D. 3031 at Whittier, Alaska. The crane was engaged in loading and unloading cargo to and from the Lewis Emery, the port side of which latter vessel was tied to the dock. The starboard side of the floating crane-barge was made fast to the starboard side of the vessel with only the customary bumper guards separating same. The testimony reflects that the distance separating the vessel and floating crane-barge was from ten inches to two feet. On the offshore side of the B.D. 3031 was another barge from which and to which cargo was handled by means of the large crane on the B.D. 3031.

There are sharp conflicts in the evidence with respect to (1) the time and date libellant sustained his injuries, (2) the ownership and control of the Jacob's ladder at the time of the accident, (3) what caused the ladder to part and whether it parted entirely or only on one side, (4) what happened to the ladder after the accident in question, and (5) how long the ladder had been in place prior to the night libellant sustained his injuries.

Other than libellant, the only eye witnesses to the accident appear to be Larson and Lottsfeldt, both members of the crew of the B.D. 3031. Larson, the night operator of the crane, was on the deck of the barge when libellant commenced his descent via the Jacob's ladder from the deck of the vessel to the deck of the B.D. 3031. Lottsfeldt, the

day operator of the crane and barge master, had accompanied libellant to supper and thereafter to a movie before returning to the Lewis Emery for the purpose of reaching the B.D. 3031.

As the B.D. 3031 was on the offshore side of the Lewis Emery, it was necessary to obtain means of access to and from the dock to which the vessel was moored. Occasionally a tug would make its way to the barge for the purpose of taking the crew to and from their meals, this due to the fact that the barge was only equipped with sleeping quarters and had no galley facilities, but the tug's visits were irregular and the evidence does not indicate that it was available for this service at all hours. Furthermore, there was no means of contact between the tug and the barge. For these reasons a Jacob's ladder was required, thus enabling the crew of the barge to climb the ladder, cross the deck of the Lewis Emery, and leave the vessel by the gangway to the dock. To return to the barge, the procedure was reversed.

■ Understandably the recollections of the witnesses as to time, dates, etc., have become dimmed by reason of passage of time. No complete investigation was made immediately following the accident, and the evidence sought to be introduced by respondents as to the details of a report filed by the Commanding Officer of the 241st Transportation Port Company at Whittier, Alaska, is replete with hearsay statements and conclusions without basis in fact to such an extent that it must be totally disregarded[1]. The log entries

---

1. It is urged that the report is admissible under 28 U.S.C. § 1732, generally referred to as the Federal Shop Book Rule. While Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467, 472, admitted in evidence a report from the Bureau of Mines to the effect that an explosion was caused by faulty steel, it is thought that the report was admitted because Congress had charged the Bureau with the responsibility of investigating the causes of such disasters through ex-

perts who presumedly had first hand knowledge of the facts stated in the report. To the same effect are E. K. Hardison Seed Co. v. Jones, 6 Cir., 149 F.2d 252, and Hunter v. Derby Foods, 2 Cir., 110 F.2d 970, 133 A.L.R. 255. The report prepared and filed by the Commanding Officer is not the result of what he actually saw as is clearly indicated from his own testimony, but contains data and conclusions which must have been given to him by the witness,

of the Lewis Emery are, however, of some importance in ascertaining certain dates and other information.

The log indicates that the Lewis Emery arrived at the Whittier dock at 9:15 p. m. on Wednesday, November 25, 1953. The next day being Thanksgiving, the first entry reflecting the presence of the barge is 1:00 p. m. on Friday, November 27, with the stevedores working in the No. 5 hatch. Notations for November 28 reveal loading activities until Noon when work was abandoned for the weekend. Stevedores resumed work at 1:00 a. m. on Monday, November 30, loading the No. 2 and No. 5 hatches. On the following date, work was completed in No. 2, and resumed in No. 1 and No. 5. A notation appears on December 3 where stevedores broke "head of key of scratch block" in No. 3 lower hold. On Saturday, December 5, loading was in the No. 4 hatch, and the day crew knocked off for supper at 5:00 p. m. Presumedly, this is when libellant and Lottsfeldt left the barge. At 8:00 p. m. the night crew (Larson) resumed crane operations and a notation states that the stevedores knocked off for lunch at midnight. At 1:00 a. m. on December 6 the stevedores resumed loading the No. 3 hatch and, at 1:30 a. m., the following item appears in the log:

"0130—Crane shifting dunnage from barge to barge along side No. 5 cut ship's Jacob's Ladder and causing G. I. Stevedore to fall to barge."

This log entry, if founded upon facts, would be very significant in the determination of this case. It is, however, predicated only upon a supposition of Grissette, the second mate of the Lewis Emery, who did not see the accident;

nor did he see the rear end of the machinery-house in which the crane's counterweights were located come in contact with the Jacob's ladder. Grissette does, however, state that he saw the machinery-house of the crane strike the ship immediately aft of the Jacob's ladder. No entry in the log appears to this effect and it is strange that the second mate, Grissette, with apparent knowledge of the location and use of the ladder, and its proximity to the point where the crane made contact with the vessel, would not have investigated further. Both Larson and Lottsfeldt vigorously deny that any part of the crane ever made contact with the starboard side of the Lewis Emery.

While Larson, Lottsfeldt, and libellant all testified that the time of the accident was approximately 10:30 p. m. on December 5, 1953, and Grissette stated that the accident had been reported to him at 1:30 a. m. on December 6, the Court is of the opinion that libellant fell a few minutes after midnight on December 6, as Grissette had just gone on duty at that time. In any event, the time of the accident is immaterial other than as the same may affect the credibility of witnesses.

◼ Unknown persons connected with the Army requested the use of a Jacob's ladder after the B.D. 3031 was secured to the starboard side of the vessel. The Chief Mate of the Lewis Emery, Trigg, was reluctant to provide same but, after being advised that the Army had none available due to a fire, finally acceded to the request. He asserts that he gave two such ladders to the Army and thereby relieved the vessel from further responsibility for same. All of the evidence indi-

Grissette. As such, the report is inadmissible. 28 Am.Jur., "Evidence", p. 866; Long v. United States, 4 Cir., 59 F.2d 602; Gilbert v. Gulf Oil Corp., 4 Cir., 175 F.2d 705; Olender v. United States, 9 Cir., 210 F.2d 795; Levin v. Green, D.C.Mun.App., 106 A.2d 136. Hospital records and other clerical entries made contemporaneously with the event by a

person charged with the duty of maintaining the records are properly admitted if they do not extend to matters of opinion and similar matters. Schering Corp. v. Marzall, D.C., 101 F.Supp. 571. Where opinions are expressed in such records they may be deleted and the balance of the report admitted. Long v. United States, supra.

cates that the ladder was made fast to the deck of the ship by the ship's personnel. Under the doctrine of Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming *per curiam*, Petterson v. Alaska S. S. Co., 9 Cir., 205 F.2d 478, it is immaterial to determine the question of ownership, supervision and control as the ship's officers were well aware of the use of the ladder and the warranty of seaworthiness remains in any event. It is, however, fair to assume that the ladder had been in use for a period of from three to six days prior to the accident and, in all probability, had been moved slightly during that time as the barge was moved to work the various hatches.

The gradual expansion of the doctrine pronounced in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698, wherein the Court held that the shipowner's obligation of seaworthiness extends to longshoremen injured while doing the ship's work aboard even though employed by an independent stevedoring contractor whom the owner hired to load or unload the ship, is apparent. Petterson, supra, is a typical example. Ross v. S. S. Zeeland, 4 Cir., 240 F. 2d 820, affords similar protection to a watchman employed by a Port Service. Carpenters, employed by independent contractors, fall within the same classification as to employment activities aboard ship. The day may come, if it has not already arrived, when the doctrine of seaworthiness will be extended to all business invitees aboard ship, for Sieracki holds that liability arises as an incident of performing the ship's service with the owner's consent.

▆▆▆ Under the present state of facts, libellant, a member of the United States Army, was engaged in assisting in loading the vessel Lewis Emery. While the cargo loaded was that of the Army and the vessel was under a Time Charter Party from Victory Carriers, Inc. to Military Sea Transportation Service, this is of no consequence. True, the loading of the vessel was for the benefit of the Army but it was also for the financial benefit of the owner. Had libellant been injured by reason of the unseaworthiness of the Lewis Emery during the actual performance of his work in loading the vessel, it would certainly have imposed liability as an incident of performing the ship's service with the owner's consent. Is there any less legal responsibility with respect to one who has completed his duties for the day and, with the owner's knowledge and consent, has used the vessel and the ladder in question as a means of access to and from the dock, where such means of access constitute the only practicable means available? This Court concludes that the reasoning in Sieracki forecloses any argument to the effect that libellant is not in the same category as a stevedore who may have completed his work and who is injured by an unseaworthy condition in leaving the vessel.

No parts of the Jacob's ladder were presented in evidence and it may be assumed that no tests were made as to its strength. Grissette testified that only one side of the ladder parted, that it was swinging by one line, and that he hauled the entire ladder to the deck of the Lewis Emery following the accident. He stated that he put the ladder between the winches for inspection by the mate to whom he reported the accident the next morning. He has no idea what happened to the ladder, but concedes that it was a part of his duty to save any such items for future use in the event of court proceedings. He told the mate where the ladder had been placed, but Trigg, the Chief Officer, has no recollection of having seen the ladder, or any part thereof, following the accident. The Commanding Officer of the 241st Transportation Port Company, Yazell, testified that, when he arrived on the scene that night, a portion of the ladder was still hanging from the vessel, with another part on the

deck of the barge, and that it was apparent the rope had recently parted as indicated by the "newness and cleanness of the ends". Larson and Lottsfeldt both stated that the ladder had parted at a point approximately three to six feet from the deck of the vessel and that all but this portion of the ladder had dropped to the deck of the barge. The Court concludes that the rope ladder parted on both sides and that Grissette was incorrect in concluding that only one side of the ladder had parted.

Grissette described the chafed lines as "worn away and frazzled". Larson refers to it as "worn out to me and frayed", and "one was frayed worse than the other was". Lottsfeldt, after stating that the two breaks were "clean" with no evidence of a "cut", stated that "it looked more like fatigue", "the ends of the rope were not unraveled", "it simply looked to me like the rope on the sides of the ladder was old", and "that it had simply parted not due to any great stress".

Assuming that the ladder was not cut by the operations of the crane, thus weakening the rope, it is not difficult to arrive at the conclusion that an unseaworthy condition existed in the legal sense, as the term "unseaworthy" has been liberally construed by more recent decisions of various appellate courts. As in Petterson, supra, there is no proof of the condition of the ladder prior to its use other than what may be implied from the accident. If the ladder was being put to a proper use in a proper manner, it is a logical inference that it would not have broken unless it was defective—that is, unless it was unseaworthy. Petterson v. Alaska S. S. Co., supra. The theory adopted is predicated upon the fact that these cases involve a specie of strict liability regardless of fault.

In determining whether the rope ladder was damaged by the crane operations, we are faced with a conflict between what may be considered affirmative and negative testimony. The crane operators, Larson and Lottsfeldt, have affirmatively stated that no part of the crane or machinery-house ever came in contact with the side of the vessel. Grissette affirmatively testified that he saw the machinery-house of the crane strike the ship immediately aft of the ladder, but that he never observed the same actually strike the ladder. He further stated:

"I made a statement to the Army itself that it was striking the ship's side and was taking off the paint."

Presumedly the foregoing statement was made to Yazell following the accident and formed the basis of Yazell's report which the Court deems to be based upon hearsay. His complaint, if made, is not entered in the log book as a complaint, although this document does reveal that other type complaints were registered with the Army. If he made such a complaint to any person other than Yazell, the evidence does not indicate when and to whom it was reported. If Grissette had suspected that the machinery-house of the crane had come in contact with the side of the vessel in the immediate vicinity of the rope ladder, it would appear that it was his duty to inspect the ladder, or at least report the matter to Larson, the night crane operator.

Faced with this conflict in the evidence, the Court concludes that the testimony of Larson is entitled to greater weight than the inferences which could be drawn from the evidence of Grissette if Larson had not testified. The Court concludes, therefore, that the rope ladder was "unseaworthy" at the time stated, and that this condition was caused by normal wear and tear arising from its use over a period of time.

While respondent contends that libellant was guilty of contributory negligence which should reduce his damages proportionately, there is no evidence to support such a theory. Libellant, before descending the ladder, looked at the top end to see that it was secured. It is urged that he should have examined

the entire ladder. Such action would require a person authorized to use a rope ladder to examine personally the entire ladder before using same. While this would be possible as to any person about to descend the ladder, it would be impossible as to any person about to ascend it. The Court holds that libellant was guilty of no contributory negligence.

Approaching the question of damages, it will be noted that libellant had just attained the age of twenty at the time of his injury in December, 1953. Prior to entering the Army for the period during which he sustained his injury, he was employed at various localities at an approximate weekly wage of $75. For a brief period of one week before being drafted, libellant held two positions working from 7:00 a. m. until after midnight, during which time he received $150 per week. It goes without saying that this furnishes no foundation for establishing loss of future earnings, as temporary employment of this nature, working 17 to 18 hours per day, would be beyond the physical ability of any normal man and would certainly reduce his life expectancy.

Libellant received his full salary while a member of the Armed Forces until his honorable discharge on June 20, 1955, with 100% disability. During the interim period he was on light duty status and spent much of his time undergoing treatment in various Government hospitals. While he sustained some injury to his back, this was of minor consequence and no complaints relating to the back are now forthcoming. The real injury involved the left wrist which, upon examination two years after the accident, reveals marked limitation of motion and weakness. Medical evidence differs only slightly with Dr. Duncan indicating 50% impairment of flexion and Dr. Vann testifying to 40% impairment. Dorsiflexion of the wrist was impaired to the extent of 25% as compared with normal degrees of extension. Libellant had full pronation and supination in his left forearm and there was no evidence of atrophy. Similarly, he has full use of all of his fingers.

The nature of his injuries is described as a fracture of the carpus scaphoid, or the left carpal navicular bone which is the bone in the hand at the wrist that is immediately next to the radius or forearm bone. It is the bone which articulates between the hand and the forearm bone at the wrist joint. The union is now complete but as late as April, 1955, the fracture had not healed. Libellant now suffers from traumatic arthritis of the left wrist which will probably increase in time. As pain still exists in the left wrist, Dr. Duncan recommends a fusion operation which would reduce the permanent-partial disability from 60% to 25%, and would involve an approximate expense of $500 and six months loss of time from work[2]. Dr. Vann disagrees with Dr. Duncan as to the wisdom of such an operation and recommends an excision of a part of the radius, referred to as radial styloid, in an effort to minimize the pain and degree of disability. Even with the anticipated operation as suggested by Dr. Vann, the permanent-partial disability is estimated at approximately 15%. Under such evidence it would appear that libellant has a 20% permanent-partial disability of his left wrist.

Such a degree of functional disability will not *per se* reduce his future earnings to the same extent. Undoubt-

---

2. Evidence as to probable future expense was admitted even though libellant was a member of the Armed Forces at the time of his injury, and would still be entitled to free medical treatment at a Veteran's Hospital under certain conditions. It would appear that libellant would be entitled to prove the fair value of medical and hospital services gratuitously furnished in any event. Sainsbury v. Pennsylvania Greyhound Lines, 4 Cir., 183 F.2d 548, 550, 21 A.L.R.2d 266; Hudson v. Lazarus, 95 U.S.App.D.C. 16, 217 F.2d 344.

edly there will be some loss of anticipated earnings to libellant who, by reason of his past activities, is required to use his wrist. Taking into consideration a 10% loss of future earnings, his probable future medical and hospital expenses[3], his pain, suffering and mental anguish, as well as the extent of the permanency of his injuries and other factors normally weighed by any court or jury hearing like matters, it is the conclusion of the Court that libellant is entitled to a decree in his favor fixing his damages at $17,500.00.

Proctors for libellant will prepare a decree carrying into effect the opinion of this Court which is adopted by the Court as its findings of facts and conclusions of law pursuant to general Admiralty Rule 46½, 28 U.S.C. and, after presentation of said decree to proctors for respondents for inspection, shall present the same to this Court for entry.

---

3. No evidence was presented as to the fair value of medical and hospital expenses gratuitously furnished by the Government prior to trial.