Arnold D. GRIES
v.
UNITED STATES.

Robert O. TAYLOR
v.
UNITED STATES.

The FIDELITY & CASUALTY COMPANY OF NEW YORK, a body corporate,
v.
UNITED STATES.
Civ. A. Nos. 12713–12715.

United States District Court
D. Maryland.
May 10, 1962.

T. Bryan McIntire, Westminster, Md., Walter C. Herlihy, Robert E. Coughlan, Jr., Baltimore, Md., for plaintiffs.

Joseph D. Tydings, U. S. Atty., and Daniel F. McMullen, Jr., Asst. U. S. Atty., District of Maryland, and Alan Raywid, Admiralty and Shipping Section, Department of Justice, Washington, D. C., for the United States.

R. DORSEY WATKINS, District Judge.

Plaintiff Gries and Taylor were and are employees of Bendix Radio Division of the Bendix Aviation Corporation. On November 21, 1959, in the ordinary course of their duties, they were assigned to make repairs to the radar installation on Texas Tower No. 2, owned by the United States Government and located on George's Bank, approximately one hundred and ten miles east of Cape Cod, Massachusetts. With the necessary equipment they drove to Otis Air Force base on Cape Cod, Massachusetts and were there directed to New Bedford, Massachusetts. There they were assigned to a Government vessel, AKL–17. The vessel departed on November 23, 1959 and after making a stop at Texas Tower No. 3, it arrived off Texas Tower No. 2 at around 5:00 P.M. The trip had been a rather rough one and the seas were heavy when the AKL–17 finally made fast to the base of the Tower.

Texas Tower No. 2 is supported on three metal pilings and has two metal decks, the top one being some eighty feet above water level. On the top deck there are two fixed cranes used for lowering and raising material and personnel to and from vessels. The method employed on this occasion involved what is familiarly referred to as a "doughnut." This is an inflated raft some ten feet in diameter with a floor and seats. Three cables connected to the doughnut and spaced approximately 120 degrees apart are fastened together some ten feet above the floor of the doughnut and the cable then ends in an eye which is joined with the head end of the crane cable. After some three or four passages of the doughnut in the removal of personnel and their gear and the taking on of the repair parts and the gear of the individual plaintiffs, the doughnut was lowered to the deck of the AKL–17 and the two individual plaintiffs, with two other individuals, entered the doughnut. The somewhat risky departure from the vessel was accomplished safely and the doughnut was raised some eighty to eighty-five feet to a point above the level of the top deck. Normally, it would then have been swung over and lowered on to the top deck. For some unexplained reason before this second movement was begun, apparently the cable broke, and the doughnut and its four occupants fell into the sea. Gries and Taylor received severe injuries, to be dealt with in more detail, and the other two occupants lost their lives.

Gries and Taylor instituted suits against the United States under the Tort Claims Act, Title 28 U.S.C.A. §§ 1346(b), 2671–2680. In the course of preliminary discussions the Government commendably [1] suggested that suit under the Tort Claims Act might not be available in view of the provisions of Title 28, Section 2680(d) excluding from the provisions of the Tort Claims Act "[a]ny claim for which a remedy is provided by Sections 741–752,[2] 781–790[3] of Title 46, re-

---

[1]. The attitude of the Government with respect to the preparation and trial of the case has been highly commendable. As indicated, the Government itself suggested the various statutes under which it believed that liability might be asserted. Also as will appear, the Government agreed with the counsel for plaintiffs to the selection of a single orthopedic surgeon to examine the two individual plaintiffs, and to testify at the trial as to their treatment.

[2]. Frequently referred to as the Suits in Admiralty Act.

[3]. Frequently referred to as the Public Vessels Act.

lating to claims or suits in admiralty against the United States." The complaints were accordingly amended so as alternatively to assert jurisdiction under Title 46 U.S.C.A. §§ 741–752 and/or §§ 781–790. It is conceded that jurisdiction exists under one or the other of these three statutory provisions.

At the conclusion of the trial, the Court requested that counsel file memoranda on the question of jurisdiction. That of the Government was first filed, and expressed the opinion that the suits were properly brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq. This conclusion, which is accepted by counsel for plaintiffs, and which appeals to the Court (and see In the Matter of the Petition of the United States of America, as owner of the United States Air Force Texas Tower No. 4, a public vessel of the United States, for exoneration from or limitation of liability, D.C.S.D.N.Y.1962, 203 F. Supp. 215, Levet, D. J.), relieves the Court of the necessity of finding that the Texas Tower No. 2 was a "public vessel of the United States", and of the task of attempting to construe the majority and dissenting opinions in Grimes v. Raymond Concrete Pile Co., 1958, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737.

Suit has also been filed under the same statutory provisions cited above by The Fidelity and Casualty Company of New York, the compensation carrier of the employer. The Government at first contested the subrogation rights of the insurance carrier on the ground that the Air Force contract with Bendix for repair services on the Texas Towers was a cost-plus-fixed-fee contract and required the carriage of Workmen's Compensation, and that the Government, having in effect paid the premiums for such coverage, under a third party beneficiary theory was itself entitled to such insurance protection. On further research the Government explicitly, and in the highest ethics of advocacy, abandoned this defense in view of the decision in United States Fidelity & Guaranty Co. v. United States, 2 Cir. 1945, 152 F.2d 46.

The Government offered no evidence and does not seriously contest the applicability of res ipsa loquitur. The problem is therefore essentially the determination of the elements of damages and their fair evaluation.

Gries and Taylor both became unconscious during the course of the fall into the water and were unconscious, or semiconscious,[4] for substantially the entire three days that they were kept on Texas Tower No. 2 after having been rescued from the water. First aid only was administered to the individual plaintiffs during their stay on the Texas Tower. By November 27 the weather had ameliorated so that it was possible to remove them by helicopter to Otis Air Force Base. They were taken by ambulance from the Air Base to St. Luke's Hospital in New Bedford, where they remained from November 27 to December 12, 1959. Both plaintiffs vividly recalled the painful trip from the Tower to St. Luke's Hospital and the extreme pain whenever their bodies were moved, which was fairly constantly because of travel, x-rays, treatments and finally the affixing of plaster casts. There can be no question both from the nature of the injuries and the hospital charts that during this period of two weeks they were most uncomfortable and that numerous pain-relieving drugs had to be administered.

On December 12, 1959, a Bendix plane was sent to New Bedford with a special pilot and nurse. The seats had been removed from the cabin and special benches installed. The plaintiffs were taken by ambulance from St. Luke's Hospital to an airplane, then flown to Friendship Airport at Baltimore, Maryland where they were met by an ambulance and taken to Union Memorial Hospital.

4. The court was very favorably impressed by the apparent frankness and fairness of the plaintiffs in testifying. There seemed to be a complete lack of any effort to exaggerate their pain and suffering. However, careful observation by the court during the two and one-half days of trial did not indicate that either plaintiff was in any appreciable distress.

The discharge diagnoses of St. Luke's Hospital adequately summarize the nature of the injuries, although they do not reflect the pain and inconvenience associated with them. The following diagnoses are given:

Arnold Gries:

> Comminuted Compression Fracture of L 5 Vertebra; Chip fracture of L 1, L 2 vertebra
> Wedging of T 11 and T 12 Vertebral bodies
> Fracture of right 7th and 8th ribs, posteriorly
> Paralytic Ileus
> Fracture of Coccyx
> Post-Traumatic Compression of L 5 and S 1 nerve roots, left secondary to fracture of L 5 vertebra
> Contusion atelectasis of right lung
> Small pneumothorax, right chest secondary to fracture ribs
> Anemia secondary to fracture of L 5 vertebral body.

Robert Taylor:

> Compression fracture of T 12 vertebral body
> Fractured sternum
> Contusion left lung
> Fracture proximal phalanx right index finger
> Paralytic ileus secondary to fracture of T 12.

At Union Memorial Hospital the plaintiffs were under the attention of an outstanding orthopedic surgeon. He applied new casts and permitted them to return home on December 21, 1959. Special arrangements in the form of hospital beds and associated equipment had been provided. About February 16, 1960, the casts were removed but neither plaintiff was permitted to get out of bed for another week, until medical corsets had been fitted. Each was permitted to stand a few seconds on March 23, 1960, the first time either had been out of bed since November 24, 1959. Their subsequent recovery was uneventful in the sense that no complications developed and each was permitted to return to work on April 11, 1960, although they were not formally discharged from orthopedic observation until a much later date. Each has been on light duty from April 11, 1960 to February 14, 1962, the date of the trial.

It is stipulated that the corporate plaintiff has paid pursuant to awards of the Maryland Workmen's Compensation Commission for temporary total and permanent disabilities, medical, hospital and nursing expenses, the sum of $7,823.92 on behalf of Gries, and $7,865.92 on behalf of Taylor. In addition, $1,600.00 in expenses were incurred by the employer in connection with the airplane trip from New Bedford, Massachusetts to Friendship Airport.[5]

At the trial (February 16, 1962) Gries testified that he had been on light work since April 11, 1960; that he had tried to do heavy work, but stiffness of his legs and pains in his back prevented this; he cannot effectively bend, lift, reach or twist. He had no present complaints or discomfort in his head, arms, upper back, or ribs; but his left leg bothered him at times; it is always a little numb, and often develops cramps when he is in bed. He has frequent trouble with his hips, the lower part of his back, and in the coccyx area. He is unable to drive an automobile for more than one hour.

Before the accident Gries was able to paint, repair and finish off rooms in his house, and take care of the shrubbery and lawn; now he has to use a riding mower. He can do a little painting in spots he can reach standing up.

Gries has received the usual "merit" raises from Bendix applicable to his rating, but claims loss of overtime, in

5. The estimated cost of these expenses is:
$  29.69 — blankets, etc.
$ 400.00 — removal of seats and installation of equipment for receipt of stretchers.
$  75.00 — nurse.
$1087.00 — aircraft and pilot expenses — Friendship Airport to New Bedford, Massachusetts and return.

amounts as to which no satisfactory evidence has been offered.

Taylor at the trial complained of a burning sensation in the sternal region, constantly present, even while testifying. He also complained of pain in the small of his back, constant except when he sleeps. Further pain is experienced on twisting, and on lifting 15–25 pounds; less than that, he can lift without trouble. He has no difficulty while riding or driving. He has tried heavy, strenuous work, but was stopped by the pain.

Before the accident Taylor built a back porch on his house; painted it, partitioned the garage, and took care of the lawn. After the accident he tried to paint a room, but could not; he also tried to lay some bricks, but could not work longer than ten minutes at the most.

Taylor also received the regular increases associated with his former type of employment, but has made no overtime since the accident. Again, no satisfactory evidence was offered with respect to any such loss of overtime.

Both plaintiffs were by agreement of all counsel sent to Dr. H. Alvin Jones, a well-known orthopedic specialist, for examination, report, and testimony. Dr. Jones' qualifications were conceded. He made his examination of the two, and studied the records of St. Luke's Hospital, and the x-rays previously taken.

Dr. Jones' "Comments" with respect to Gries were as follows:

"At the time of this young man's accident, now slightly more than two years ago, he sustained multiple major injuries when he fell from quite a height, and very fortunately, I would presume, in that he fell into water. His injuries included by history at least a probable head injury, for he was unconscious, multiple rib fractures and possibly some pleural damage by reason of what he described as hemoptysis, and multiple injuries to his lower spine. The spine injuries were said to have been accompanied with at least a transient neurological deficit, involving his lower extremities, and a late complication indicative of a thrombophlebitis affecting his left leg. By way of the patient's history and lack of complaints, he seems to have made a full functional recovery with regard to the injuries that he sustained to his head and chest, and currently at least I am unable to find any neurological abnormalities of his lower extremities, so that in this regard likewise any neurological complications that might have accompanied his original spine injuries seem to have been fully compensated for.

"His present chief complaint and post-traumatic residua are primarily confined to his lower back (lower lumbar and sacral spine and coccyx).

"The current x-rays, and unfortunately we were unable [6] to review the initial x-rays of this man's spine, show a most unusual picture, for when this part of his spine was injured there were multiple fractures involving the posterior elements and the bodies of the 5th lumbar vertebra and the upper sacrum. The pedicle fractures were such as to permit some forward displacement of the 5th lumbar vertebral body and the upper sacrum on the 4th lumbar vertebra, but fortunately with the healing process that followed almost a complete spontaneous fusion of the involved vertebral segments has occurred. This may not be as complete as it did appear on x-ray judging from the patient's persistent symptoms, and the fact that he obtains temporary relief with the use of a spinal brace from time to time. This may also mean that at some time in the future should this patient's symptoms remain unchanged he may require a more effective surgical fusion of the posterior lower lumbar

6. After the examination and preparation of his report, Dr. Jones did see the earlier x-rays of Gries. They were exhibited in court, and did not lead to any change in Dr. Jones' opinion or prognosis.

and sacral spine. In addition to the lumbosacral injuries, this young patient also sustained a fracture of his lower sacrum and upper coccyx. These fractures have healed in relatively good position and with minimal residual complaints. The thrombophlebitis, which I believe involved the deep pelvic veins on the left side, and which, of course, complicated the sacral injuries, seems to have been followed by a fairly satisfactory compensatory collateral circulation, for there is only the most minimal residual static edema of the patient's left lower extremity, and some periodic numbness of his left foot. I have learned from the patient that the last time he consulted Dr. Johnson, his attending orthopedic surgeon, with regard to his continued complaints was some time during the past summer, and I can only assume from this that Dr. Johnson has terminated all treatment that he thinks is warranted for this young man. On the other hand, as I have stated above, I am not entirely satisfied that further improvement of his back may not be accomplished with a surgical fusion of the posterior elements of his lower spine. It is quite true that on x-ray it would appear that the anterior portions of the lumbosacral spine appear to be spontaneously fused with exuberant excessive amount of new bone formation, but I am not too sure as to how firmly fused the posterior elements might be particularly in the regions of the pedicle facet joints, and particularly on the left side. Should this be necessary in the future, it might reduce his present disability to some degree, but not likely to any great degree. In assessing the current disability of this man's back, it is my opinion that this amounts to 40%. With regard to the mild static edema that affects his left lower extremity, and which is, as discussed above, secondary to an old thrombophlebitis, there is some disability also of this part amounting to 15% and is permanent."

Dr. Jones' "Comments" with respect to Taylor were as follows:

"When this young man was injured slightly more than two years ago, he sustained some very major injuries when he fell from a very great height and fortunately landed in water; apparently he fell in a sitting position jack-knifing his spine, sustaining a severe compression fracture of the 12th thoracic vertebra. In addition to this spine injury, he was unconscious for an indetermined time, and probably had some degree of cerebral concussion. He, also, sustained injuries to his chest. In reviewing his early x-rays, I was unable to define any true rib fractures, but he did have a fracture of the mid portion of his sternum, and he very probably had some atelectasis of his right lung judging from some of the earlier chest x-rays. Fortunately as far as his spine injury was concerned, he did not have any demonstrable spinal cord or nerve root injury, but from his history, he probably had a paralytic ileus, for his early treatment would indicate such, and this is a very common transient complication of spine injuries. The chest and internal complications were only of transient character, for within ten days after the patient's accident definitive treatment for his spine was initiated, and x-rays shortly thereafter disclosed a very excellent reduction of the compression fracture. However, subsequently some of the correction was lost, and the patient has a residual deformity at the site of his injury, plus multiple degeneration of intervertebral discs adjacent to it. His present complaints are primarily referable to his spine injury.

"At the time of interviewing and examining this young man, I learned that he was last seen by his attending orthopedic surgeon, Dr. J. T. H.

Johnson only as recently as October 30, 1961, at which time further x-ray examination of his dorsal-lumbar spine was taken. The patient apparently has never been finally dismissed by Dr. Johnson, and I do not know whether it might be because of the fact that he might have something more in mind with regard to further definitive treatment or not, but it would seem to me that judging from the continued symptoms all referable to the dorso-lumbar spine region which he describes, and the fact that he is required from time to time to resume wearing his spinal brace, and the current radiographic findings of a partial interbody fusion between T-11 and T-12 being a failure for complete fusion of these segments, and the evidence of degeneration of the adjacent intervertebral disc structures between T-11 and T-12, and T-12 and L-1, this man very definitely is a candidate for surgical fusion of this part of his spine. He certainly is not going to improve beyond his present status without such a procedure, and whereas it is somewhat conjectural as to how much further improvement might be considered with such a surgical fusion, it would stand to reason that he would be likely to improve some, and possibly enough to be able to permanently discard the use of his spinal brace. This recommendation, of course, is one of individual surgical judgment. In assessing the patient's present spine disability, it is my opinion that this represents fully 40%.

"With regard to the injury that the patient sustained to his chest, there is little actually in the form of any objective residua. The site of the sternal injury is sensitive, and the patient describes some gastric disturbances, which he attributes to the injury to his chest, but which I doubt are actually of any traumatic origin. His symptoms to me suggest those of pylorospasm, and are probably of functional origin. I do not believe that he has any true impairment of function referable to the initial injury that he sustained to his chest. It is my opinion that with the further lapse of time, and the lessening of his present nervous tension that the sternal and epigastric symptoms should disappear."

Dr. Jones' testimony was substantially from, and in accord with, the quoted "Comments" with the following amplifications: Taylor is a "candidate for surgical spinal fusion"; if he does not have one, his condition is permanent, and should remain static. Fusion should reduce the pain factor, and so reduce permanent disability to about twenty five per cent. A fusion should be successful in this location.

A spinal fusion would require about three weeks hospitalization (at $20.00 a day) plus care for two to three months and a brace for six months. Surgery and follow-up would run $500 to $600.00, and a brace would cost about $100.00.

Gries' condition would "almost justify an exploratory" operation, but Dr. Jones would be inclined to wait, to see if there is any increase in symptoms. A fusion would probably reduce the pain factor in the lumbo-sacral area, but not in the coccyx, or in the left leg.

### Damages

■■ It was agreed that the following data were correct, for such use, if any, as the court might make of them:

|  | Age | Life Expectancy | Work Expectancy | Present Value $1.00* |
|---|---|---|---|---|
| Taylor | 36 | 35.68 | 28.2 | 16.663 |
| Gries | 31 | 40.29 | 32.8 | 18.148 |

* (for 28 and 33 years, respectively, commuted at 4%).

Plaintiffs claim damages for

1. Loss of wages and loss of earning power.

2. Permanent disability.

3. Pain and suffering: past, present and future.

Obviously, there is an overlapping. Loss of earning power (if any) and pain and suffering, are all associated with the permanent disability. The court will make no independent allowance for the disability as such, but will reflect such disability with respect to earning power and pain and suffering.

(1) (a) Loss of wages to date of trial.

No legally sufficient evidence has been offered as to any loss in earnings to the date of trial, and no allowance will be made with respect thereto.

(b) Loss of earning power.

The testimony is that while Bendix has no legal obligation arising out of any union contract, or agreement with employees or specifically with the plaintiffs, its policy in the past has been quite liberal in its retention, with regular increases and without loss of comparable straight-time pay, of employees injured on the job. However, there is no guaranty that this policy will continue. Change of management; loss of cost-plus contracts; loss of business or an economic recession might well result in a reduction of the labor force; and those in "made" jobs might well be expected to be among the first to go. Moreover, plaintiffs' position in the labor market, generally, is impaired. They are not as free voluntarily to seek other employment as they would have been but for the accident. The court believes that an allowance of approximately $1,000 per year for their work expectancy would be reasonable. This results (in rounded figures) in an award of $17,500 to Taylor and $20,000 to Gries.

(2) Pain and suffering.

(a) To date of trial.

To some extent the nature of the pain and suffering sustained by plaintiffs has been indicated, and might reasonably be assumed from the nature of the injuries. There should additionally be noted the "paralytic ileus" condition each experienced. Tubes running through the nose and stomach into the intestines were required for several days. Also should be considered the long periods of immobilization, casts and spinal supports. The court believes that an award of $10,000 to each plaintiff would be fair and reasonable, and so finds.

(b) For the future.

Apparently plaintiffs will be subject to pain the balance of their natural lives. This, in Dr. Jones' opinion, will be "nagging but not excruciating." The court finds that $15,000 to each plaintiff would be fair and reasonable.

(As indicated above, the element of permanent disability is reflected in each of the foregoing allowances).

In addition, plaintiffs should be allowed the fair value of expenditures on their behalf by Bendix, in connection with their return from St. Luke's Hospital. Plank v. Summers, 1954, 203 Md. 552, 102 A.2d 262; Sainsbury v. Pa. Greyhound Lines, 4 Cir. 1950, 183 F.2d 548, 21 A.L.R.2d 266; United States v. Price, 4 Cir. 1961, 288 F.2d 448, 449–450. This amounts to $1,591.69 or $795.85 a piece.

Plaintiff, The Fidelity & Casualty Company of New York, is awarded an amount equal to the compensation awards and medical and hospital expenses incurred and paid on account of the individual plaintiffs, viz., $7,823.22 as to Gries, and $7,865.92 as to Taylor.

*Recapitulation.*

The clerk is directed to enter judgments as follows: Taylor $43,295.85 ($17,500, $10,000, $15,000, $795.85); Gries $45,795.85 ($20,000, $10,000, $15,000, $795.85); The Fidelity & Casualty Company of New York—$15,689.14; with costs, and interest at the rate of 4% per annum from March 7, 1961.